**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>FTS FINANCIAL, INC., KEVIN MICHAEL SYMONS, and JERRY AUSTIN SIMMONS,<br><br>        Defendants. | Case No. 16-7513<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**<br><br>JURY TRIAL DEMANDED |

Plaintiff, U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.    SUMMARY

1.    From at least in or around August 2012 and continuing through in or around November 2013 (the "Relevant Period"), Defendant FTS Financial, Inc. ("FTS") and FTS's principal, Defendant Kevin Michael Symons ("Symons"), fraudulently promoted and sold access to an online futures "trading" forum referred to as the "Real Time Trade Room" (the "Room" or the "RTTR").

2.    FTS, by and through its employees and agents including Symons, marketed the Room, which was operated by Defendant Jerry Austin Simmons ("Simmons"), as a way for clients or prospective clients (collectively, "Clients") to observe Simmons as he traded futures contracts "live" and in "real time."  As alleged below, this was false because Simmons in fact never actually traded any futures contracts at all in the Room.  When FTS told Clients that Simmons traded live and in real time, FTS, by and through Symons, knew that the statements

were false or else acted with reckless disregard as to whether Simmons in fact actually traded futures contracts in the Room.

3.     In promoting the Room, Defendants FTS, Symons, and Simmons knowingly or recklessly made numerous false and misleading statements to Clients, including:  (1) false and misleading statements concerning Simmons' experience and success trading futures contracts; (2) false and misleading statements concerning Simmons' "live" trading in the Room; and (3) false and misleading statements concerning Simmons' supposed past profitability trading futures contracts in the Room.

4.     FTS, by and through its employees and agents including Symons, placed thousands of solicitation calls to members of the public and took in more than $2.5 million in connection with FTS's fraudulent promotion of the Room.

5.     Notwithstanding its fraudulent solicitation of Clients, according to FTS's website, FTS provided its clients with "best in class educational opportunities, mentoring, live trading rooms, and trade alerts," and FTS's mission was to "scour the globe to find the very best educators, traders, and technicians; those with proven real time excellence in fundamental and technical analysis and a long history of verifiable success."

6.     Although the Defendants portrayed Simmons as an experienced and highly profitable trader who executed trades in the Room "live" with real money at risk, the reality of Simmons' purported trading was far different.

7.     Simmons in fact never earned a single dollar of trading profit in the Room for the simple reason that he never actually executed any trades.  He only engaged in hypothetical or simulated "trading" in the Room, and he never placed any actual money at risk.  Moreover, Simmons was not the experienced, professional trader that the Defendants claimed.  What little

futures trading Simmons has actually done in his own personal trading account occurred for a short time in the 1970s and was not profitable.

8.      After Clients purchased access to the Room, Simmons further solicited them to participate in what Simmons termed the Broker Assist Program ("BAP").  Simmons described the BAP to Clients as a way for Simmons to, in his words, "direct[]" the trading in Client accounts.  Under the BAP, Clients opened futures trading accounts with a broker specified by Simmons and authorized Simmons to manage the trading in their futures accounts.  Nevertheless, during the Relevant Period, Simmons was not registered in any capacity with the Commission.

9.      By directly or indirectly making false and misleading statements and omissions of material fact to Clients and by misrepresenting the risks associated with trading futures contracts on or subject to the rules of a registered entity while acting as a Commodity Trading Advisor ("CTA") and by use of the mails or any means or instrumentality of interstate commerce, FTS violated Sections 4$o$(1)(A) and (B) and 6(c)(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6$o$(1)(A) and (B) and 9(c)(1) (2012), and Commission Regulations 4.41(a)(1) and (2) and 180.1, 17 C.F.R. §§ 4.41(a)(1) and (2) and 180.1 (2015).

10.     Additionally, FTS violated Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015), by presenting simulated or hypothetical performance information without providing a required disclosure setting forth the inherent limitations of such information.

11.     Symons controlled FTS throughout the Relevant Period and did not act in good faith or knowingly induced FTS's violations of the Act.  Therefore, Symons is also liable pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), for FTS's violations of Sections 4$o$(1)(A) and (B) and 6(c)(1) of the Act, 7 U.S.C. §§ 6$o$(1)(A) and (B) and 9(c)(1) (2012), and

Commission Regulations 4.41(a)(1) and (2) and 180.1, 17 C.F.R. §§ 4.41(a)(1) and (2) and 180.1 (2015).

12.     FTS's employees and agents, including Symons, committed the acts and omissions alleged herein within the course and scope of their employment, agency, or office with FTS.  Therefore, FTS is liable, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2015), as principal for the violative actions and omissions of FTS's employees and agents, including Symons.

13.     In addition, Symons and Simmons directly violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1, 17 C.F.R. § 180.1 (2015) by directly or indirectly making false and misleading statements and omissions of material fact to Clients and by misrepresenting the risks associated with trading futures contracts.

14.     In addition to being directly liable for fraud as set forth in paragraph 13, by his conduct described herein, Simmons also willfully aided and abetted FTS's violations of Sections 4*o*(1)(A) and (B) and 6(c)(1) of the Act, 7 U.S.C. §§ 6*o*(1)(A) and (B) and 9(c)(1) (2012), and Commission Regulations 4.41(a)(1) and (2) and 180.1, 17 C.F.R. §§ 4.41(a)(1) and (2) and 180.1 (2015), and is therefore liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012).

15.     By soliciting Clients to participate in the BAP and by failing to register with the Commission as an Associated Person of a CTA or a CTA, Simmons violated Section 4k(3) of the Act, 7 U.S.C. § 4k(3) (2012), and Commission Regulation 3.12(a) (2015).

16.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their

compliance with the Act, and to further enjoin them from engaging in commodity-related activity, as set forth below.

17.     In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

18.     Unless restrained and enjoined by this Court, Defendants likely will continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     <u>JURISDICTION AND VENUE</u>

19.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

20.     Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because the Defendants transacted business in this District, and certain transactions, acts and practices alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## III.     <u>THE PARTIES</u>

21.     Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

22.     Defendant FTS is a California corporation with a principal place of business in Irvine, California.  According to the California Secretary of State's website, FTS is "FTB Suspended," meaning that the company has been "suspended or forfeited by the Franchise Tax Board for failure to meet tax requirements (*e.g.*, failure to file a return, pay taxes, penalties, interest)."  During the Relevant Period, FTS was in the business of marketing various financial services including Simmons' Room.  FTS has never been registered with the Commission in any capacity.

23.     Defendant Symons is an individual who resides in Foothill Ranch, California. Symons was owner of FTS and controlled its day-to-day operations.  Prior to starting FTS, Symons worked with a company that the CFTC charged with engaging in the fraudulent solicitation of two automated futures trading systems.  *See CFTC v. CTI Group, LLC, et al.*, 12-CV-3754 (S.D.N.Y. 2014) (federal court ordering defendants in that action to pay over $29 million in disgorgement and fines).  Symons was not registered with the Commission in any capacity during the Relevant Period.

24.     Defendant Simmons is an individual who resides in Charlotte, North Carolina. During the Relevant Period, Simmons operated the Room and solicited Room Clients to open managed futures trading accounts over which Simmons maintained trading authority.  Although Simmons has been registered with the Commission as a CTA and Associated Person since April 2014 and was previously registered with the Commission from 2003 to April 2012 in various capacities including as a CTA and as an Associated Person of a Commission registrant, Simmons was not registered with the Commission in any capacity during the Relevant Period.

## IV.    FACTS

*FTS Solicited Clients to Purchase Access to Simmons' Room*

25.    During the Relevant Period, Simmons operated the Room, an online forum in which subscribers, for a fee, could observe Simmons as he ostensibly traded futures contracts. FTS was retained to solicit members of the public to purchase access to Simmons' Room during the Relevant Period.

26.    According to FTS's website:

> At FTS Financial our mission is to provide a select clientele with best in class educational opportunities, mentoring, live trading rooms, and trade alerts.  To achieve this mission we will scour the globe to find the very best educators, traders, and technicians; those with proven real time excellence in fundamental and technical analysis and a long history of verifiable success.  As a firm that is fundamentally driven by research, education and technology we are determined to develop or procure the best of the best in our field.  Above all we will strive consistently to be a vital and trusted partner to our clients and associates, providing a place where a select few can prosper and grow to reach their financial potential.

27.    During the Relevant Period, FTS marketed Simmons' Room primarily by mass telephone solicitations and on FTS's website, as an online forum in which subscribers could learn to trade futures contracts by observing Simmons (portrayed to Clients by FTS as a "professional trader"), as he supposedly traded "live" and in "real time."

28.    Simmons told Clients that the "primary trading vehicle" in the Room was futures contracts.  Promotional materials for the Room stated that Simmons "targets five to eight trades per day," focusing on S&P 500, Russell 2000, crude oil, gold, and interest rate futures contracts, each of which is traded on or subject to the rules of a designated contract market.

29.    FTS told Clients that in addition to observing Simmons as he traded, Clients could make money by buying and selling the same futures contracts in their own accounts, following the trades that Simmons purportedly was making live in the Room.

30.    During the Relevant Period, FTS made between 700 and 1,000 cold calls daily to solicit prospective Clients around the United States to purchase access to the Room.  During FTS's telephone solicitations, FTS's salespeople directed prospective Clients to FTS's website, www.ftsfinancial.com.

31.    FTS offered prospective Clients a money-back guarantee, pursuant to which FTS promised to refund a Client's purchase price if Simmons' trading in the Room did not average a profit of $200 or more per trading day during the first 10 days the Client had access to the Room.

32.    FTS charged Clients a one-time fee ranging from $4,995 to $7,500 for six months of access to the Room (as well as access to various other videos and training materials).  FTS kept approximately 75% of the purchase price and paid the remaining approximately 25% to the company with which Simmons was affiliated.

33.    After completing a sale to a Client, FTS provided instructions to Clients for downloading trading software that Clients could use to execute futures trades in their own trading accounts.  FTS told Clients that this software was needed to participate in the Room and to execute the Clients' own trades.

*FTS Acted as a Commodity Trading Advisor*

34.    During the Relevant Period, FTS, for compensation or profit, engaged in a business of advising others as to the value, or the advisability, of trading futures contracts, by promoting Simmons' Room and by receiving compensation from members of the public who purchased access to Simmons' Room.

*FTS, Symons, and Simmons' Misrepresentations and Material Omissions Regarding the Room*

35.    FTS sales scripts, which were used by FTS salespeople to solicit Clients for the Room, referred to Simmons as a "professional Mentor/Trader with over 35 years of experience"

and stated that "[i]n 1985, [Simmons] realized a career goal by becoming a full-time professional trader."

36.     Similarly, FTS's website described Simmons as a "professional trader."  Symons had ultimate responsibility at FTS for making decisions about the content on FTS's website.

37.     As Symons has admitted in sworn testimony, FTS, by and through its salespeople, told Clients that Simmons traded futures contracts "live" with real money at risk.  For example:

a.  FTS' website stated that Simmons "[t]rades live in real time," that Room participants have the "ability to see [Simmons'] trades from start to finish . . . [f]rom entry to trade management to trade exit," and that Simmons "averages 3-5 live trades each day."

b.  FTS's sales scripts, which were used by FTS's salespeople during telephone solicitations, stated that "[n]ow, the live trading room from where this is taught and traded is a very unique, online experience, where you will have complete access to [Simmons] while he is teaching and trading live with his own capital the ENTIRE trading day."

c.  FTS, by and through its employees or agents, told one Client by email on April 24, 2013 that "there is absolutely no reason you should feel uncomfortable, [Simmons'] is a highly respected veteran trader with tremendous consistency! . . . [Simmons] is trading live each day with a cash account…."

38.     Simmons knew that FTS told Clients that he, Simmons, traded "live" with real money at risk, as illustrated by the following email exchange (a portion of which is referred to above, in paragraph 37(c)):

    a.   On or around April 22, 2013, a Client stated in an email to Simmons that "[w]hen FTS sold me your system they showed me some of your very impressive monthly portfolio results . . . of 30 to 60% per month."

    b.   The Client also stated, "I was basically wondering if the account [traded by Simmons in the Room] is a cash account or a demo account.  You seem to get in and out of trades so easily it made me wonder."

    c.   Later, on April 24, 2012, the Client emailed FTS, stating "I also can't seem to get the answer about if the trades [Simmons] makes in the room are a cash account or demo account...That should be easy one to answer."

    d.   FTS responded, <u>copying Simmons</u>, that "[Simmons] is trading live each day with a cash account . . . to teach & demonstrate to all clients in the [Room] . . . how to enter & execute trades with conservative risk management to limit exposure to loss & to be consistently profitable . . . ."

39.    Indeed, Simmons himself told Clients by email that he engaged in "live" trading in the Room.  Simmons sent certain Clients an email after they decided to purchase access to the Room, including emails Simmons sent to multiple Clients dated January 14, 2013, stating that "coupled with **<u>live market trading in the Real Time Trade Room (RTTR)</u>**, [our training materials] offer[] a comprehensive training program uniquely qualified to improve, enhance, and expand the overall ability and performance of any individual ranging from a novice beginner to a seasoned professional" (emphasis added).

40.    FTS's statements to Clients concerning Simmons' experience as a "professional trader" and FTS and Simmons' statements to Clients that Simmons traded "live" in the Room

were false because Simmons has never actually traded any futures contracts in the Room at all, much less earned his livelihood from futures contract trading profits.

41.     Simmons never put any money at risk when "trading" in the Room.  Rather, Simmons either called out hypothetical trades in the Room or demonstrated hypothetical or simulated trades in the Room on an electronic trading platform in simulation mode, but in either case never actually executed any futures trades in the Room and never actually placed any money at risk.

42.     When FTS told Clients that Simmons was a "professional trader" and that he traded "live" in the Room with real money at risk, FTS by and through its principal Symons, knew that those statements were false or acted with reckless disregard as to the truth or falsity of those statements.

43.     After completing sales of Room access to Clients, FTS provided Clients an agreement (referred to herein as the "Room Agreement") that Simmons required Clients to sign prior to accessing the Room.  The Room Agreement expressly stated that all of Simmons' trades were simulated.  Consequently, FTS and Symons knew, or should have known, that Simmons did not trade in the Room "live" with real money at risk.

44.     The Room Agreement stated, in relevant part, that:

> [t]here is no representation that the trading strategies, signals, or trades are executed with real money.  While trade setups maybe [sic] discussed and described in a fashion suggesting real time execution, *trade setup execution (entry, management, and exit) will be done in Simulation Mode . . . .  There are no suggestions or implications any trade could have been executed real time in a fully funded account*.

(Emphasis added.)

45.     When some Clients expressed concern (after purchasing access to the Room) that the representations in the Room Agreement were inconsistent with FTS's representations about

Simmons' purported live trading in the Room, FTS, Symons, and Simmons downplayed the Room Agreement.  For example:

a.  In an August 24, 2012 email, an individual who worked with Simmons and Symons told them that a new Room Client "said he had just received the disclosures[, and h]e mentioned a ph[r]ase in the paper work that said some of the trades may not be real money or to that effect…*We cleared that up and he warmed up on the phone somewhat*" (emphasis added).

b.  In a September 24 and 25, 2012 email chain (which was forwarded to Simmons), a Client asked if an FTS representative could explain the sentence in the Room Agreement stating that:  "There are no suggestions or implications any trade could have been executed real time in a fully funded account."  The FTS representative responded:  "Wow.  No, I can't.  *I thought [Simmons] made live trades with real money usually . . . I'm told this is just standartd [sic] boiler plate language for these sorts of services . . . .*" (emphasis added).

c.  In a November 27, 2012 email between Simmons and Symons, in which they discussed a Client's concern with the Room Agreement, Simmons stated to Symons that the "[t]he reference to SIM [i.e., Simulated] Trading is there *only to prevent any conflicts with [National Futures Association] Regulations*" (emphasis added).  Symons replied to Simmons that "[i]f you told [the Client] exactly what you just wrote down in your email response to me that would make [the Client] feel very comfortable moving forward[.]"

46.     The difference between actual trading and hypothetical or simulated trading is significant because hypothetical or simulated trading does not involve trades that have actually been executed and therefore may under- or over-compensate for the impact of certain market factors such as lack of liquidity.

47.     Moreover, because hypothetical or simulated trading does not involve actual trade execution, so-called performance results from such trading necessarily fail to reflect slippage costs, *i.e.*, the difference in price of an actual trade at the time the order is placed and the time the order is filled.

48.     Symons conceded in sworn testimony that, unlike trading in an actual account with real money at risk, simulated trading results do not include slippage.  Symons also stated in his sworn testimony that slippage "most times" has a negative effect on the profitability of a trading account and that the distinction between live and simulated trading would be "most important" to a reasonable investor.

49.     Nevertheless (and despite knowing that the Room Agreement stated that Simmons' trading in the Room was entirely simulated), FTS, by and through its salespeople and on its website, told prospective Clients that Simmons traded "live" with actual money at risk.

50.     Not only did FTS tell Clients that Simmons traded "live," but also that he made substantial profits doing so.  FTS claimed on its website that Simmons "[a]verages $350-$500+ in gains a day on two contracts," *i.e.*, on a $20,000 investment (which, if annualized, amounts to an average profit of 420% to 600%).  FTS did not disclose that these supposed results were based on hypothetical or simulated trading.  Nor did FTS provide any of the disclosures required in Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015), setting forth the limited value of hypothetical or simulated trading results.

51.     FTS stated to a Client in a January 4, 2013 email that by following Simmons'
example, the Client's profits could "turn out to be much more" than $4,000 over 20 days on a
$20,000 investment and further stated "that there's [a] great deal of money to be made over the
course of one year in Jerry's room and by God you will make it if you just try it."

52.     In a January 6, 2013 email to the same Client, FTS, by and through its employee
or agent, stated that the Room is:

> listed right on our website as one of the top ten trading rooms in the country at
> Futures Truth Magazine.  There are numerous testimonials and you can even
> speak to a classmate to make you feel 100% comfortable . . . if you have ever had
> dream [sic] of financial independence while trading just a few hours a day, this is
> it and that's the truth . . . I promise you.

53.     In addition, in soliciting Clients, FTS and Symons provided Clients the following
track record of Simmons' monthly trading profit for 2012:

| Month | Profit |
|-------|--------|
| January | $8,230 |
| February | $6,350 |
| March | $7,880 |
| April | $8,410 |
| May | $10,380 |
| June | $9,650 |
| July | $10,800 |
| August | $8,730 |
| September | $7,180 |
| October | $8,290 |
| November | $4,110 |
| December | $3,280 |

54.     FTS's salespeople told Clients that the profits set forth above in paragraph 53
reflected a $20,000 investment (which, for the claimed profits in 2012, would have amounted to
an annual return of more than 460%).

55.     Simmons created the past performance information set forth above in paragraph
53, knowing that the performance information would be used by FTS to solicit Clients.

56.     Simmons testified under oath that none of this past performance information was ever based on any actual trading.  Rather, Simmons stated that when he created the performance information for January to July 2012, he used his "best estimate."  Simmons testified that he came up with the performance history (1) by consulting notes he made regarding the general daily performance of his hypothetical or simulated trades and (2) for those days that he did not have such notes, by reconstructing the hypothetical trades that he believed he _would have made_ based on his trading plan.

57.     All of these statements by FTS and Simmons concerning Simmons' supposed profitable past performance in the Room (including the profit claims on FTS's website alleged in paragraph 50, above, and the monthly profits created by Simmons and disseminated by FTS described in paragraph 53, above) were false and misleading because Simmons never actually traded any futures contracts in the Room, much less earned any trading profit doing so.

58.     FTS and Symons provided Clients the past performance information created by Simmons even though Simmons described the results as "unofficial" to Symons in emails dated August 2 and 8, 2012.

59.     Simmons created an "orientation" video, access to which was provided to FTS Clients who purchased access to the Room.

60.     In that video, Simmons was described as a "master trader," "a fantastic talent," and "an unbelievable trader, incredibly successful, high-level trader."  The video described Simmons as being "at the absolute pinnacle of his profession" and stated that "he is at the absolute top of this trading game not just in our country but in the world."

61.     The video further stated that Simmons trades "live" in the Room and that "you'll actually see him physically enter the trade order…you'll see that order get filled and then you'll

see the order either go on to be a winner or to be a loser, so all that is going to be happening right before your eyes, pretty cool."

62.     In the video, Simmons himself referred to "live trades" in the Room, stated that "we do real time trading [in the Room] throughout the day," and stated that he would identify "key trading opportunities," and that "we're going to average three to five trades a day."

63.     By referring to "live" trading in the Room (both in the emails referred to in paragraph 39 and the video referred to in paragraphs 59 to 62, above), Simmons knowingly or recklessly created the false impression that he traded futures contracts in the Room with real money at risk.

64.     By creating the false impression that he traded futures contracts in the Room with real money at risk, Simmons misled Clients regarding his expertise trading futures contracts. Indeed, Simmons testified under oath that, although he never actually traded futures contracts in the Room, he "absolutely" believed that "trades executed live [with a] real-time executed brokerage statement" were more authentic than simulated trades because simulated trades do not account for slippage.

65.     The statements contained in paragraphs 39 and 59 through 62, above, concerning Simmons' live trading in the Room were false and misleading because Simmons in fact never actually traded any futures contracts in the Room.

66.     Moreover, Simmons was not the experienced, successful professional trader that the Defendants claimed.  What little futures trading Simmons had actually done (trading in his personal trading account for a short time in the 1970s) had not been profitable.

*Simmons Solicited Managed Accounts But Failed to Register with the Commission*

67.     After Clients purchased access to the Room, Simmons further solicited those Clients to participate in the BAP.

68.     Clients who elected to participate in the BAP agreed to pay a fee in exchange for which Simmons agreed to manage the futures trading in those Clients' accounts.

69.     In a promotional video created by Simmons and distributed to Room Clients for the purpose of soliciting them to participate in the BAP, Simmons asserted that the BAP was designed for individuals who "do not have enough time to actively trade the markets during the day."

70.     Many, if not most, of the Clients who were solicited to participate in the BAP, had previously purchased access to the Room after having been solicited by FTS.

71.     Consequently, these Clients had been told, falsely, that Simmons was a successful professional trader and that he had earned substantial profits trading live in the Room.  As alleged above, these claims by FTS and Simmons were false.

72.     Despite the fact that Simmons had not actually traded futures contracts since the 1970s and despite the fact that those efforts had not been successful, Simmons stated in the BAP solicitation video that the BAP had a monthly income goal of $1,500 on a $20,000 investment (which amounts to an annual return of 90%).

73.     In order to participate in the BAP, Clients were required to open futures trading accounts with a broker specified by Simmons and to deposit funds into their trading accounts.

74.     According to the promotional video created by Simmons to solicit for the BAP, Simmons would "direct[]" Client accounts.  BAP Clients were required to execute a letter of

direction that obligated the broker to execute trades in Clients accounts following, Simmons' directions.

75. Clients agreed to pay a monthly fee for participation in the BAP, to be calculated based on the amount of capital deposited by the Client into his or her trading account.

76. Despite the fact that Simmons had authority to trade BAP participant accounts, and despite the fact that Simmons solicited BAP Clients, Simmons was not registered in any capacity with the Commission during the Relevant Period.

*Symons Controlled FTS and Failed to Act in Good Faith or Knowingly Induced FTS's Violations*

77. During the Relevant Period, Symons was the sole owner of FTS.

78. Symons was FTS's President and CEO.

79. Symons had authority to hire and fire FTS employees and contractors.

80. Symons was signatory on FTS's bank account.

81. Symons was responsible for training FTS's salespeople.

82. Symons controlled the content on FTS's website, which, as alleged above, falsely stated, among other things, that Simmons traded in the Room "live" and in "real time" and that Simmons earned substantial profits doing so.

83. Symons directed FTS's salespeople to tell Clients that Simmons traded "live" with real money at risk.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE:
### (Violations of Section 4*o*(1)(A) and (B) of the Act and Commission Regulation 4.41(a), Commodity Trading Advisor Fraud)

84. Paragraphs 1 through 83 of this Complaint are re-alleged and incorporated herein by reference.

85.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2012), defines a CTA as:

any person who (i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in— (I) any contract of sale of a commodity for future delivery, security futures product, or swap…

86.     Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), provides that:

It shall be unlawful for a [CTA]…by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client…or prospective client…; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client…or prospective client….

87.     Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2015), provides that no CTA may advertise in a manner which "(1) [e]mploys any device, scheme or artifice to defraud any…client or prospective…client [or] (2) [i]nvolves any transaction, practice or course of business which operates as a fraud or deceit upon any…client or any prospective…client."

88.     During the Relevant Period, FTS, for compensation or profit, engaged in a business of advising others as to the value, or the advisability, of trading futures contracts, by promoting Simmons' Room and by receiving compensation from members of the public who purchased access to Simmons' Room.

89.     During the Relevant Period, FTS, acting as a CTA, through the use of the mails or other means or instrumentality of interstate commerce (including by telephone, email, and FTS's website), violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2012), and Commission Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) (2015), by making misrepresentations and material omissions to Clients, including by:

a.  Telling Clients in sales solicitation and on FTS's website that Simmons traded "live in real time" in the Room with real money at risk when in fact all of Simmons supposed trading was entirely simulated; and

b.  Telling Clients that Simmons was a "professional trader" and that Simmons earned consistent profits trading futures contracts (including by providing Clients the supposed track record set forth above in paragraph 53 and claiming on FTS's website that Simmons "[a]verages $350-$500+ in gains a day on two contracts,") when in fact Simmons never traded any futures contracts in the Room, much less earned any trading profit doing so.

90.  Each and every misrepresentation and omission by FTS (by and through its employees and agents including Symons), including but not limited to those specifically alleged herein, was made with the knowledge that, or made with reckless disregard of the fact that, it was false and misleading.

91.  Each material misrepresentation or omission made by FTS including, but not limited to those specifically alleged herein, constitutes a separate and distinct violation of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2012), and Commission Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) (2015).

92.  The foregoing acts, omissions, and failures of FTS's employees and agents, including Symons, occurred within the scope of their employment, office, or agency with FTS; therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2015), FTS is liable for these acts, omissions, and failures and for its employees and agents' violations of Section 4*o*(1)(A) and (B) of the Act, 7

U.S.C. § 6o(1)(A) and (B) (2012), and Commission Regulation 4.41(a)(1) and (2), 17 C.F.R.

§ 4.41(a)(1) and (2) (2015).

93.     Symons directly or indirectly controlled FTS and did not act in good faith or

knowingly induced the acts constituting FTS's violations, and is therefore liable, pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), for FTS's violations of Section 4o(1)(A) and

(B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2012), and Commission Regulation 4.41(a)(1) and

(2), 17 C.F.R. § 4.41(a)(1) and (2) (2015).

94.     By providing misleading past performance information to FTS knowing that FTS

would use that information to solicit Clients, by falsely touted Simmons' "live" trading, and by

misrepresenting Simmons' experience and success trading futures contracts, Simmons willfully

aided and abetted FTS's violations of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A)

and (B) (2012), and Commission Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2)

(2015).  Simmons is therefore liable for these violations pursuant to Section 13(a) of the Act, 7

U.S.C. § 13c(a) (2012).

## COUNT TWO:
### (Violations of Section 6(c)(1) of the Act and Commission Regulation 180.1, Fraud in Connection with Commodity Futures)

95.     Paragraphs 1 through 94 of this Complaint are re-alleged and incorporated herein

by reference.

96.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), in relevant part, prohibits

any person from directly or indirectly using or employing, in connection with any contract of

sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of

any registered entity, any manipulative or deceptive device or contrivance in contravention of

such rules and regulations as the Commission shall promulgate.

97.     Pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), the Commission promulgated Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015), which in relevant part, prohibits any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, from intentionally or recklessly:  (1) using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, any untrue or misleading statement of a material fact or omitting to state a material fact necessary in order to make the statements made not true or misleading; or (3) engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

98.     FTS and Symons employed a scheme or artifice to defraud Clients in connection with futures contracts traded on registered entities by making misrepresentations and material omissions to Clients, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015), including by:

      a.  Telling Clients in sales solicitation and on FTS's website that Simmons traded "live" in the Room with real money at risk, when in reality all of Simmons supposed trading was entirely simulated; and

      b.  Telling Clients that Simmons was a "professional trader" and that Simmons earned consistent profits trading futures contract (including by providing Clients the supposed track record set forth above in paragraph 53 and claiming on FTS's website that Simmons "[a]verages $350-$500+ in gains a day on two contracts,") when in fact Simmons never traded any futures contracts in the Room, much less earned any trading profit doing so.

22

99.     Simmons employed a scheme or artifice to defraud Clients in connection with futures contracts traded on registered entities by making misrepresentations and material omissions to Clients, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015), including by:

   a.  Providing to FTS and Symons a false and misleading performance record of his purported "trading" in the Room, knowing that the results were not based on records of trades taken in the Room but rather were Simmons' "best estimate" of his supposed profits based in large part on after-the-fact reconstructions of hypothetical trades that he believed he would have taken, and knowing that FTS and Symons would use that performance record to solicit Clients;

   b.   Telling Clients (including, for example, by email to multiple Clients on January 14, 2013) that he engaged in "live market trading" in the Room (when in reality, Simmons only ever engaged in hypothetical or simulated trading); and

   c.  Creating promotional material that was made available to Clients that falsely described Simmons variously as, among other things, a "master trader," "a fantastic talent," and "an unbelievable trader, incredibly successful, high-level trader," and falsely stated that Simmons traded "live" in the Room and that referred to Simmons' "live trades" (when in reality Simmons never actually traded futures contracts in the Room and what little experience Simmons had trading futures contracts for himself – in the 1970s – had not been successful).

100.    Each and every misrepresentation and omission by FTS, Symons, and Simmons, including but not limited to those specifically alleged herein, was made with the Defendants' knowledge that, or made with the Defendants' reckless disregard of the fact that, the misrepresentations and omissions were false and misleading.

101.    Each material misrepresentation or omission made by FTS, Symons, and Simmons including, but not limited to those specifically alleged herein, constitutes separate and distinct violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015).

102.    The acts, omissions, and failures alleged in this Complaint of FTS's employees and agents, including Symons, occurred within the scope of their employment, office, or agency with FTS; therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2015), FTS is liable for these acts, omissions, and failures and for its employees and agents' violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015).

103.    Symons directly or indirectly controlled FTS and did not act in good faith or knowingly induced the acts constituting FTS's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1 (2015), and is thus liable, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), for FTS's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015).

104.    By providing misleading past performance information to FTS knowing that FTS would use that information to solicit Clients, by falsely touting Simmons' "live" trading, and by misrepresenting Simmons' experience and success trading futures contracts, Simmons willfully

aided and abetted FTS's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2012), and

Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2015).  Simmons is therefore liable for

these violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012).

### COUNT THREE:
### (Violations of Commission Regulation 4.41(b), Failure to Provide Disclosures Regarding Simulated or Hypothetical Performance)

105.    Paragraphs 1 through 104 of this Complaint are re-alleged and incorporated

herein by reference.

106.    Commission Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2015), provides that

no person may present the performance of any simulated or hypothetical commodity interest

account, unless a prescribed statement (stating, among other things, the inherent limitations of

simulated or hypothetical performance information) is disclosed prominently and in immediate

proximity to the simulated or hypothetical performance being presented.

107.    As alleged above, Simmons only engaged in simulated or hypothetical trading in

the Room.  FTS, through the acts of its employees and agents including Symons, violated

Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015), in that FTS stated on its website

that Simmons "[a]verages $350-$500+ in gains a day on two contracts" in the Room, but failed

prominently to display in immediate proximity to this performance information the prescribed

disclosures relating to the inherent limitations of such simulated or hypothetical performance

information.

108.    Each and every instance in which FTS (by and through its employees and agents)

provided simulated or hypothetical performance information without also providing the

prescribed disclosures relating to the inherent limitations of such simulated or hypothetical

performance information, including, but not limited to those specifically alleged herein,

constitutes a separate and distinct violation of Commission Regulation 4.41(b), 17 C.F.R.

§ 4.41(b) (2015).

109.     Each and every instance in which FTS employees or agents provided simulated or

hypothetical performance information without also providing the prescribed disclosures relating

to the inherent limitations of such simulated or hypothetical performance information, occurred

within the scope of their employment, office, or agency with FTS; therefore, pursuant to Section

2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R.

§ 1.2 (2015), FTS is liable for these acts, omissions, and failures and for its employees and

agents' violations of Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015).

110.     Symons directly or indirectly controlled FTS and did not act in good faith or

knowingly induced, directly or indirectly, the acts constituting FTS's violations of Commission

Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015), and thus is liable, pursuant to Section 13(b) of

the Act, 7 U.S.C. § 13c(b) (2012), for FTS's violations of Commission Regulation 4.41(b), 17

C.F.R. § 4.41(b) (2015).

### COUNT FOUR:
### (Violations of Section 4k(3) of the Act and Commission Regulation 3.12(a), Failure to Register as an Associated Person of a Commodity Trading Advisor)

111.     Paragraphs 1 through 110 of this Complaint are re-alleged and incorporated

herein by reference.

112.     Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), provides that "[i]t shall be

unlawful for any person to be associated with a commodity trading advisor as a partner, officer,

employee, consultant, or agent (or any person occupying a similar status or performing similar

functions), in any capacity which involves . . . the solicitation of a client's or prospective client's

discretionary account . . . unless  such person is registered with the Commission . . . as an associated person of such commodity trading advisor . . . ."

113.    Commission Regulation 1.3(aa)(4), 17 C.F.R. § 1.3(aa)(4) (2015), defines an Associated Person ("AP") of a CTA as any natural person who is associated with a CTA "as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) The solicitation of a client's or prospective client's discretionary account, or (ii) the supervision of any person or persons so engaged."

114.    Simmons solicited Clients to participate in the BAP program, pursuant to which Clients gave Simmons authority to manage their futures trading accounts.  Simmons did so as a partner, officer, employee, consultant, or agent of an entity that acted as a CTA.

115.    Each Client who participated in the BAP was required to (1) open a trading account with a broker specified by Simmons, (2) agree to pay a monthly fee based on the amount of funds deposited by the Client in his or her trading account, and (3) execute a letter of direction obligating the broker to trade the Client's account following Simmons' directions.

116.    During the Relevant Period, Simmons was not registered in any capacity with the Commission.

117.    By soliciting managed futures accounts but failing to register with the Commission as an Associated Person of a CTA, Simmons violated Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), and Commission Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2015).

## VI.    <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A.      An order finding that Defendants FTS, Symons, and Simmons are liable for violations of Sections 4$o$(1)(A) and (B) and 6(c)(1) of the Act, 7 U.S.C. §§ 6$o$(1)(A) and (B) and 9(c)(1) (2012), and Commission Regulations 4.41(a)(1) and (2) and 180.1, 17 C.F.R. §§ 4.41(a)(1) and (2) and 180.1 (2015);

B.      An order finding that Defendants FTS and Symons are liable for violations of Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015).

C.      An order finding that Defendant Simmons is liable for violations of Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), and Commission Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2015);

D.      An order of permanent injunction prohibiting Defendants FTS, Symons, and Simmons, and any other person or entity associated with them, from engaging in conduct in violation of Sections 4$o$(1)(A) and (B) and 6(c)(1) of the Act, 7 U.S.C. §§ 6$o$(1)(A) and (B) and 9(c)(1) (2012), and Commission Regulations 4.41(a)(1) and (2) and 180.1, 17 C.F.R. §§ 4.41(a)(1) and (2) and 180.1 (2015);

E.      An order of permanent injunction prohibiting Defendants FTS and Symons, and any other person or entity associated with them, from engaging in conduct in violation of Commission Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2015);

F.      An order of permanent injunction prohibiting Defendant Simmons, and any other person or entity associated with him, from engaging in conduct in violation of Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), and Commission Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2015);

G.      An order of permanent injunction prohibiting Defendants and any of their successors from directly or indirectly:

1)      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2)      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2015)), for their own personal accounts or for any accounts in which they have a direct or indirect interest;

3)      Having any commodity interests traded on their behalf;

4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015); and/or

7)      Acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2015)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015);

H.      An order requiring Defendants, as well as any of their successors, to disgorge,

pursuant to such procedure as the Court may order, all benefits received,

including but not limited to salaries, commissions, loans, fees, revenues, and

trading profits derived, directly or indirectly, from acts or practices that constitute

violations of the Act or Commission Regulations as described herein, including

pre- and post-judgment interest thereon;

I.      An order requiring Defendants, as well as any of their successors, to make full

restitution, pursuant to such procedure as the Court may order, to each and every

person or entity whose funds were received or utilized by them in violation of the

provisions of the Act or Commission Regulations, as described herein, including

pre- and post-judgment interest thereon;

J.      An order directing Defendants and any of their successors to rescind, pursuant to

such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between them and any of the customers whose

funds were received by them as a result of the acts and practices which constituted

violations of the Act or Commission Regulations as described herein;

K.      An order requiring Defendants, jointly and severally, to pay civil monetary

penalties under the Act, to be assessed by the Court, in amounts of not more than

the greater of (1) triple Defendants' monetary gain or (2) $140,000 for each

violation of the Act or Commission Regulations as described herein;

L.      An order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

M.      An order providing such other and further relief as the Court may deem necessary

and appropriate under the circumstances.

Dated: September 26, 2016                    Respectfully submitted,

                                             U.S. COMMODITY FUTURES TRADING
                                             COMMISSION


                                              _s/ R. Stephen Painter, Jr._____
                                             R. Stephen Painter, Jr.
                                             Senior Trial Attorney
                                             spainter@cftc.gov
                                             (*Pro hac vice* admission application to be filed)

                                             David W. MacGregor
                                             Chief Trial Attorney
                                             dmacgregor@cftc.gov
                                             (*Pro hac vice* admission application to be filed)

                                             Manal M. Sultan
                                             Deputy Director
                                             msultan@cftc.gov

                                             Division of Enforcement
                                             U.S. Commodity Futures Trading Commission
                                             140 Broadway, 19th Floor
                                             New York, NY 10005
                                             (646)746-9700
                                             (646)746-9940 (facsimile)